No. C-604

**In the Matter of the Estate of Helen G. Bonfils, a/k/a Helen G. Bonfils Davis; Donald R. Seawell and Earl R. Moore v. Edward Mike Davis, a/k/a/ Edward Michael Davis**

(543 P.2d 701)

Decided December 15, 1975.          Rehearing denied January 5, 1976.

Arthur J. Goldberg; Predovich and Ward, Lester L. Ward, Jr.; Gorsuch, Kirgis, Campbell, Walker and Grover, Robert J. Kapelke, for petitioners.

Belli, Ashe & Choulos, Melvin M. Belli, Michael Youngfellow; McNichols, Nigro & Baldridge, Joseph F. Nigro, for respondent.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

Certiorari was granted to review the decision of the court of appeals in *In Re Est. of Bonfils*, 34 Colo. App. 268, 529 P.2d 340. We reverse.

Petitioners, Donald R. Seawell and Earl R. Moore, as proponents of the will of Helen G. Bonfils, seek to reverse the judgment of the court of appeals which upheld the right of respondent, Edward Mike Davis, to attack in the Denver probate court the decree of divorce entered in the Denver district court, dissolving the marriage between decedent, Helen G. Bonfils, and respondent Davis. If successful in setting aside the divorce decree, Davis, as surviving husband, would inherit a substantial portion from the estate of Helen G. Bonfils.

Respondent was married in 1959 to Helen G. Bonfils. In a divorce proceeding in the Denver district court, in which both parties appeared and were represented by counsel, a decree of divorce on the ground of cruelty was granted to plaintiff Bonfils on December 21, 1971. A stipulation and agreement was entered into by the parties, which recited that the par-

ties were desirous of mutually and finally settling all questions with respect to their property, and with respect to alimony, and the legal obligations of each, without litigation, in the event the court should grant a decree of divorce. The agreement awarded to respondent the following: promissory notes in the amount of $1,672,140, payable to the order of The First National Bank of Denver, executed by respondent, which plaintiff had guaranteed and which she had previously paid; the real property known as 707 Washington Street, Denver, together with the contents thereof; and $50,000 in cash. Each party to the agreement waived, released and relinquished all right, title, interest, claim or demand which he or she may have had against the other for property of the other, arising out of the marriage relationship, or any agreement with respect thereto, as well as all rights of inheritance, or to any estate which might vest by reason of the death of the other party. No appeal was taken from the decree of divorce.

For several years prior to the divorce, the plaintiff Bonfils had been suffering from extreme health problems and had been confined for protracted periods at St. Joseph's Hospital. She died on June 6, 1972, leaving an estate worth several million dollars. Probate proceedings were thereafter commenced and, on December 20, 1972, respondent filed his caveat, by reason of which this controversy exists. With leave of the court, on April 25, 1973, he filed an amended caveat, specifying in greater detail the grounds which he contended justified setting aside the decree of divorce and which would entitle respondent to inherit from the estate of Helen G. Bonfils as the surviving widower.

The amended caveat asserted that the decree of divorce was void, a nullity, and of no force and effect because of extrinsic and collateral fraud and undue influence practiced against the plaintiff and the respondent, and upon the court, by the proponents of the will and other unknown persons; and that the fraud against respondent prevented him from having a fair opportunity to present his case so that there was not a fair submission of the controversy, which amounted to a fraud upon the court in procuring the decree in divorce.

In support of the allegations of fraud and undue influence, the caveat set forth in much detail a series of acts allegedly perpetrated over a long period of time by the proponents of the will, and unknown persons, as a grand conspiracy, scheme, and design to deprive the plaintiff Bonfils of the dominion and control over her vast resources and to enable the conspirators to assume dominion and control themselves, and to thus deprive the lawful objects of plaintiff's bounty of their rightful inheritance. Among the acts in furtherance of this conspiratorial design to break up the marriage of the parties were: the maligning of respondent's character and conduct by spreading false and malicious rumors about him in and about *The Denver Post*, and St. Joseph's Hospital where plaintiff was periodically

confined; the distributing of calumnious photographs of respondent, captioned "Warning: this man is armed and dangerous"; the exerting of efforts to prevent respondent from seeing and visiting with his wife; the importuning and prevailing upon plaintiff to create the Helen G. Bonfils Foundation to receive the assets of her estate, putting them beyond the control of respondent, all while she, in a frail physical and mental condition, was exhausted, worn out, weak, mentally clouded, not strong-minded, disoriented, confused, and therefore incapable of rendering an intelligent judgment and decision on matters of importance, including the obtaining of a divorce, creation and establishment of trusts and the making of a will.

Further allegations related to threats made that the operational management of *The Denver Post* would abandon the *Post* unless she acceded to the wishes of the conspirators, including the divorcing of respondent; further, that plaintiff was effectively sequestered from him in the hospital against her will; and that, after he had obtained court permission to visit with her and had done so, she was again sequestered from him and not permitted to communicate with him, either personally or by telephone. It was alleged that although plaintiff did not desire a divorce from respondent, she did so as a result of the undue influence of the proponents of the will, for the purpose of obtaining the dominion and control of her property. Further, the conspirators fraudulently caused to be represented to respondent that the divorce proceedings were plaintiff's voluntary wish and that he was thereby prevented from presenting a good and valid defense and, in truth, establishing that decedent did not desire a divorce, all of which constituted a fraud upon the plaintiff, the respondent, and the court.

Respondent further asserted that he had neither knowledge nor, by the exercise of due diligence, could he have learned of the existence of the conspiracy; that he first became aware of its existence after the last will was filed for probate; and that, because of such fraudulent concealment, he was deprived of presenting a good and valid defense and of establishing the fact that decedent did not desire a divorce.

Respondent contended that all of the foregoing constitute extrinsic fraud upon the parties and upon the court, and that therefore the divorce decree was null and void, as was the property settlement of the parties. Respondent tendered to the registry of the court all of the proceeds and property received under the stipulation and agreement.

In response to the amended caveat, petitioners filed a motion to dismiss, which was granted by the probate court. The court ruled that, assuming the truth of all of the allegations of the amended caveat, it did not show extrinsic fraud which affected the jurisdiction of the court to enter the divorce decree. The court of appeals reversed the probate court's ruling and held, first, that the probate court has subject matter jurisdiction to determine all "legal questions" arising out of the proceedings before it, in-

cluding the validity of the divorce decree; and, second, that the amended caveat sufficiently alleged extrinsic fraud. It remanded the cause with directions that the collateral attack on the divorce decree be considered on its merits.

I.

We first consider the question of the probate court's power to determine the validity of a divorce decree entered by a Colorado district court. The Colorado Constitution, Article VI, Section 9(3), provides:

"In the city and county of Denver, exclusive original jurisdiction in all matters of probate, settlements of estates of deceased persons, appointment of guardians, conservators and administrators, and settlement of their accounts, the adjudication of the mentally ill, and such other jurisdiction as may be provided by law shall be vested in a probate court * * *."

A corresponding statute is section 13-9-103(3), C.R.S. 1973, which relates to the Probate Court of the City and County of Denver, and which provides:

"The court has jurisdiction to determine every legal and equitable question arising in connection with decedents', wards', and absentees' estates, so far as the question concerns any person who is before the court by reason of any asserted right in any of the property of the estate or by reason of any asserted obligation of the estate * * *."

These constitutional and statutory provisions vest in the probate court the authority to decide, *inter alia*, matters relating to the probate of wills, They do not, however, confer authority upon the probate court to disregard the rules relating to collateral attacks on judgments and to set aside a divorce decree of a district court which has jurisdiction of the parties and of the subject matter. *See Hill v. Benevolent League*, 133 Colo. 349, 295 P.2d 231. To hold otherwise would invite litigants unsuccessful in other forums to launch a barrage of attacks in the probate court on judgments rendered elsewhere. Of course, if a district court judgment is void for want of jurisdiction, any court, including the probate court, may properly declare it to be the nullity it is. Thus, we face the issue of whether the district court's divorce decree was such a nullity.

II.

The court of appeals held that caveator's allegations were sufficient to make out a prima facie case of extrinsic fraud: caveator was fraudulently induced to consent to the divorce, thereby being prevented from asserting defenses available to him. We disagree.

The distinction between fraud "extrinsic" and that "intrinsic" to a judgment has often been recognized in our jurisprudence. *United States v. Throckmorton*, 98 U.S. 61, 25 L.Ed. 93; *Fahrenbruch v. People,* 169 Colo. 70, 453 P.2d 601; Annot., 88 A.L.R. 1201; *cf. French v. Terriere,* 153 Colo. 326, 386 P.2d 352; *Devereux v. Sperry*, 104 Colo. 158, 89 P.2d

532. Extrinsic fraud goes to the jurisdiction of the court to hear a case and amounts to a subversion of the legal process itself.

When extrinsic fraud is shown to exist, the judgment may be collaterally attacked, for such fraud renders the judgment not merely irregular, but void. As such, the judgment has neither life nor incipience — as a nullity it may be attacked directly or collaterally at any time. *Davis v. Klaes*, 141 Colo. 19, 346 P.2d 1018; *Davidson Chevrolet v. Denver*, 138 Colo. 171, 330 P.2d 1116; *Perdew v. Perdew*, 99 Colo. 544, 64 P.2d 602. Intrinsic frauds, however, cannot give rise to collateral attack, though they may create voidable judgments, be the basis of a successful direct appeal, or be the subject of a motion for relief from judgment under C.R.C.P. 60(b).

We have examined the record and it is clear to us that whatever fraud there may conceivably have been in connection with the present controversy did not affect the district court's jurisdiction over the divorce suit. Respondent and his wife, both of whom were represented by counsel, appeared voluntarily and submitted to the jurisdiction of the court. If there was fraud perpetrated against respondent, it was at most intrinsic fraud.

The respondent remains only the ex-husband of the deceased plaintiff, not her widower. As a divorced spouse, he lacks standing to contest the probate proceedings. As held in *Dominguez v. Booth*, 101 Colo. 192, 72 P.2d 276, unless the contestant will take or may take by an adjudication that the will in question is invalid, he has not sufficient interest to give him legal standing to contest its validity.

Accordingly, the judgment of the court of appeals is reversed, with directions to remand for reinstatement of the order of the probate court dismissing the caveat of respondent.

MR. JUSTICE ERICKSON does not participate.