The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
November 29, 2018

## 2018COA169

**No. 17CA0864, *Estate of Little* — Family Law — Common Law
Marriage; Probate — Wills and Will Contracts — Reformation to
Correct Mistakes**

The decedent executed a will during her lifetime devising her
estate to her spouse, from whom she later divorced. After her
death, her ex-husband claimed that he was entitled to inherit under
her will because he and the decedent had remarried at common law
before she died. Alternatively, he sought reformation of her will,
contending that she intended to devise her estate to him regardless
of their marital status.

The trial court found that the ex-husband, who by operation of
law was removed as a beneficiary of the decedent's will upon their
divorce, failed to show that he and the decedent remarried at
common law. Relying on *In re Estate of Johnson*, 2012 COA 209,

the trial court also concluded that the decedent's ex-husband lacked standing to seek reformation of her will.

In this opinion, a division of the court of appeals affirms the trial court's finding of no common law remarriage, but reverses on the standing issue. The division declines to follow *Johnson* and instead concludes, based upon an examination of the revocation and reformation statutory schemes, that a former spouse is not foreclosed on standing grounds from seeking reformation under these circumstances.

COLORADO COURT OF APPEALS                                    **2018COA169**

Court of Appeals No. 17CA0864
Custer County District Court No. 15PR30006
Honorable Ramsey Lama, Judge

In re the Estate of Caroline Little, deceased.

Jeffrey Lynn Curry,

Petitioner-Appellant,

v.

Humane Society of Colorado, American Cancer Society, and American Society
for the Prevention of Cruelty to Animals

Respondents-Appellees.

ORDER AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE WELLING
Román and Dunn, JJ., concur

Announced November 29, 2018

Evans Case, LLP, Aaron L. Evans, Timothy D. Bounds, Denver, Colorado, for
Petitioner-Appellant

Jenna L. Mazzucca Esq., PC, Jenna L. Mazzucca, Salida, Colorado, for
Respondents-Appellees

¶ 1    This case involves a dispute over who is entitled to inherit the estate of Caroline Little. On appeal, Little's former husband, Jeffrey Lynn Curry, first contends that the trial court erred in finding that he and Little were not common law remarried as of the time of her death. If they were, the parties agree that he would be entitled to inherit her estate under the terms of her will. Curry also contends that, even if they were not remarried, the trial court erroneously found that he lacked standing to seek reformation of her will. Curry sought to reform Little's will to reflect her intention to devise her estate to him regardless of their marital status. The contingent beneficiaries of Little's will, the Humane Society of Colorado, the American Cancer Society, and the American Society for the Prevention of Cruelty to Animals (collectively, the Interested Parties), urge us to affirm the trial court's rulings.

¶ 2    Although we are not persuaded that the trial court erred in finding that Curry and Little were not common law remarried, we disagree with the trial court's conclusion that Curry lacked standing to seek reformation. We, therefore, affirm in part, reverse in part, and remand for further proceedings on Curry's reformation claim.

1

## I.     Background

¶ 3     Curry and Little met in 1972 and were common law married in 1980.  Together they operated a building construction and restoration business.

¶ 4     In 2006, they executed mutual wills devising their estates to each other.  Little's will stated, "I am married to Jeffrey Lynn Curry. Any reference in my will to my spouse is to such person."  The will devised her estate "to my spouse, if my spouse survives me."  The will also provided that, "[i]f my spouse does not survive me," her estate is devised in equal shares to the Interested Parties.

¶ 5     They lived together in a house in Westcliffe, Colorado, until 2010.  In 2010, Curry and Little divorced, and a divorce decree was entered on March 29, 2010.  After the divorce, Curry moved away, but eventually returned to Westcliffe.  Upon returning, he lived in a church building adjacent to the house where he and Little had lived together.  Little lived in the house, which she received in the divorce.  They continued to operate their business together.

¶ 6     In April 2015, Little's residence was destroyed by a fire. Following the fire, Little moved into Curry's residence.  There, she slept in a separate bedroom in the basement.  Her insurance

company paid for her to rent the bedroom and furniture from Curry. Insurance investigators spoke to Little after the fire, and in their report, they listed Curry as her "ex-husband."

¶ 7 Little died on June 19, 2015.

¶ 8 In January 2016, Curry filed a petition with the trial court asserting that he was entitled to inherit Little's estate because he was her common law spouse at the time of her death. He also alleged that Little intended for him to inherit her estate and requested reformation of her will to conform with her alleged intent. The Interested Parties opposed Curry's petition.

¶ 9 In January 2017, the trial court held a two-day hearing on the petition. At the hearing, the Interested Parties introduced evidence that, between 2010 and 2015, Curry and Little completed forms for tax and insurance purposes representing that they were divorced. The Interested Parties introduced evidence that Curry and Little filed individual tax returns in 2012 and 2013, that Little described her relationship with Curry as that of "Bus[iness] Partner[s]" in a loan application, that Little identified herself as divorced in an application for Medicaid benefits, that Curry identified himself as "separated" in an application for Medicaid benefits, and that Little

3

identified Curry as her "[e]x-husband" in a homeowner's insurance application. The Interested Parties also introduced a voice recording that Little left for her insurance company identifying Curry as her "ex-husband."

¶ 10    Curry introduced testimony from several witnesses, including two employees of their business and one of Little's friends. The employees testified that Curry and Little spent considerable time together after the divorce and referred to each other as "husband" and "wife" when scheduling appointments and when picking up prescriptions at the pharmacy. Little's friend testified that Curry and Little resumed life as a couple after the divorce.

¶ 11    On the second day of the hearing, the trial court found that "reformation and/or theory of mistake under common law did not apply to the case" and dismissed Curry's reformation claim on the ground that he lacked standing to assert such a claim. On March 28, 2017, the trial court issued a written order making findings of fact and concluding that Curry and Little were not remarried at common law when she died.

## II.    Analysis

¶ 12    When a marriage — common law or otherwise — is dissolved, any revocable disposition of property made by the divorced individual to the former spouse is revoked by operation of law, *see* § 15-11-804(2), C.R.S. 2018, unless revocation is contrary to "the express terms of a governing instrument, a court order, or a contract relating to the division of the marital estate made between the divorced individuals," *id.*; *In re Estate of DeWitt,* 54 P.3d 849, 852 (Colo. 2002).

¶ 13    On appeal, Curry does not dispute that, based on the terms of Little's will, his divorce from Little removed him as a beneficiary of her will pursuant to section 15-11-804(2).  But the same statute provides that any spousal transfer provisions in a will that are revoked upon divorce are "revived by the divorced individual's remarriage to the former spouse." § 15-11-804(5).  Curry contends that the provisions in Little's will devising her estate to him were revived by their common law remarriage.

¶ 14    In the alternative, Curry contends that when Little executed her will she intended for him to inherit her estate regardless of their marital status.  On that basis, he sought to reform Little's will

5

pursuant to section 15-11-806, C.R.S. 2018, to reflect that intention. On appeal, he contends that the trial court erroneously found that he lacked standing to pursue the reformation claim. Curry does not contend that he is entitled to inherit Little's estate on any basis other than that (1) he and Little were remarried at common law, or (2) Little's intent at the time she executed the will was for him to inherit, regardless of their marital status.

¶ 15     For the reasons below, we affirm the trial court's finding of no common law remarriage. But we reverse the trial court's ruling that Curry lacked standing to seek reformation and remand for further proceedings on the reformation claim.

### A. The Trial Court Did Not Err in Finding that Curry and Little Were Not Remarried at Common Law

¶ 16     Curry contends that the trial court's determination that he and Little were not remarried at common law is erroneous in two respects. First, he contends that reversal is required because the trial court failed to apply the more lenient standard of proof applicable to common law *remarriage*, as set forth in *In re Estate of Peterson*, 148 Colo. 52, 365 P.2d 254 (1961). Second, he contends that the trial court's finding was erroneous because the elements of

common law remarriage were conclusively established at the hearing. For the reasons set forth below, we disagree with both contentions.

### 1. Standard of Review

¶ 17 Because this case was tried to the court, our review of the trial court's findings of fact is highly deferential. "We defer to the court's credibility determinations and will disturb its findings of fact only if they are clearly erroneous and not supported by the record." *Lawry v. Palm*, 192 P.3d 550, 558 (Colo. App. 2008). "When the evidence is conflicting, a reviewing court may not substitute its conclusions for those of the trial court merely because there may be credible evidence supporting a different result." *Citywide Banks v. Armijo*, 313 P.3d 647, 649 (Colo. App. 2011) (quoting *Lawry*, 192 P.3d at 558). But we review de novo the trial court's application of the governing legal standards. *Lawry*, 192 P.3d at 558.

### 2. Legal Principles

¶ 18 In Colorado, "[a] common law marriage is established by the mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship." *People v. Lucero*, 747 P.2d 660, 663 (Colo. 1987); *see*

7

*also Klipfel's Estate v. Klipfel*, 41 Colo. 40, 46, 92 P. 26, 28 (1907) (recognizing common law marriage as valid and binding). Mutual consent need not be reduced to writing or expressed through words, *Smith v. People*, 64 Colo. 290, 293, 170 P. 959, 960 (1918), but the parties' conduct must evidence their mutual understanding that they are husband and wife, *see Lucero*, 747 P.2d at 663.

¶ 19    When direct evidence of an agreement between the parties to be common law married or remarried is unavailable, the two factors that most clearly demonstrate an intent to be married are (1) cohabitation, and (2) a general reputation in the community that the parties hold themselves out as husband and wife. *Id.* at 665. Cohabitation in this context means "holding forth to the world by the manner of daily life, by conduct, demeanor, and habits, that the man and woman have agreed to take each other in marriage and to stand in the mutual relation of husband and wife." *Smith*, 64 Colo. at 294, 170 P. at 960.

¶ 20    In determining whether the parties intended to be married, "the conduct of the parties provides the truly reliable evidence of the nature of their understanding or agreement." *Lucero*, 747 P.2d at 664. Relevant conduct "includes maintenance of joint banking and

8

credit accounts; purchase and joint ownership of property; the use of the man's surname by the woman; . . . and the filing of joint tax returns." *Id.* at 665. However, "any form of evidence that openly manifests the intention of the parties that their relationship is that of husband and wife will provide the requisite proof from which the existence of their mutual understanding can be inferred." *Id.*

¶ 21 Regarding common law *remarriage* specifically, our supreme court has held that the standard of proof is less "exacting and scrupulous" than for common law marriage. *See Peterson*, 148 Colo. at 53-55, 365 P.2d at 255-56; *see also Ward v. Terriere*, 153 Colo. 326, 332, 386 P.2d 352, 355 (1963) (*Peterson* "holds that the evidence in such cases may be less than the positive and convincing proof necessary to establish a common law marriage.").

### 3. Analysis

#### a. Curry Has Not Shown that the Trial Court Applied an Incorrect Standard of Proof

¶ 22 Curry contends that the trial court applied an incorrect standard of proof in finding that he and Little were not remarried at common law.

¶ 23    First, he contends that the trial court's failure to expressly

refer to *Peterson* in its written order shows that the trial court failed

to apply the correct standard.  We are not persuaded.

¶ 24    It is true that, in its written order, the trial court did not

explicitly state the applicable standard of proof it applied.  But

where a trial court does not specify the standard of proof, we

presume that it applied the correct standard.  *See People in Interest*

*of R.W.*, 989 P.2d 240, 243 (Colo. App. 1999) (absent contrary

indication in the record, the trial court is assumed to have applied

the correct standard of proof); *Auslaender v. MacMillan*, 696 P.2d

836, 837 (Colo. App. 1984) (trial court is presumed to have applied

correct standard of proof in the absence of any contrary statement).

It is Curry's burden to overcome this presumption.  *Auslaender*,

696 P.2d at 837.

¶ 25    Curry does not argue, nor does the record reflect, that the trial

court expressly applied an incorrect legal standard in any part of its

judgment.  Indeed, the trial court articulated the correct elements

for evaluating whether a common law marriage had been proven.

Instead, Curry argues that the error is reflected in the trial court's

failure to cite *Peterson* and its ultimate finding of no common law

remarriage. But the trial court's order finding no common law remarriage was well reasoned and thorough, containing extensive findings of fact that are amply supported by the record. And based on those findings — which include weighing the evidence and assessing the credibility of witnesses — the trial court concluded that "[t]he most reliable evidence shows that Ms. Little considered herself divorced and Mr. Curry her ex-husband." We simply cannot discern a basis in the record for concluding that the trial court applied an incorrect standard of proof. *Cf. In re Marriage of Farr*, 228 P.3d 267, 269 (Colo. App. 2010) (the trial court's finding that the wife's testimony was more credible than the husband's indicated that it applied a preponderance of the evidence standard). Accordingly, we reject Curry's contention that the trial court applied an incorrect legal standard.

¶ 26     Second, Curry contends that the trial court's failure to expressly recognize the distinction between common law marriage and remarriage requires reversal. We are not persuaded by this contention either. In *Ward*, our supreme court rejected an identical contention of error under strikingly similar circumstances. *Ward* involved an appeal from a judgment of no common law remarriage.

11

153 Colo. at 327, 386 P.2d at 353. In *Ward*, the appellant contended that the trial court made its findings before the supreme court's decision in *Peterson* and, therefore, erroneously applied the law to the question of common law remarriage. *Id.* at 331, 386 P.2d at 355. Curry's argument here is nearly identical. But the supreme court in *Ward* rejected this contention and affirmed, explaining that

> [t]he *Peterson* case does not and was not intended to strip a trial court of its fact-finding function. At most it merely set a standard with which a trial court shall weigh the evidence in cases involving common law remarriage and holds that the evidence in such cases may be less than the positive and convincing proof necessary to establish a common law marriage.

*Id.* at 331-32, 386 P.2d at 355. As discussed in the next part of this opinion, we discern no grounds for reversal here that were not considered and rejected in *Ward*.

b.     Common Law Remarriage Was Not Established

¶ 27     Curry next argues that the trial court erred because the evidence introduced at the hearing established the existence of a common law remarriage under the *Peterson* standard. We are not persuaded.

¶ 28    As a threshold matter, we reject Curry's initial argument that *Peterson* itself supports reversal because its facts are "almost identical." The court in *Peterson* mentions *only a single fact* about the parties' relationship — that their divorce was preceded by twenty years of common law marriage. 148 Colo. at 55, 365 P.2d at 256. No other details about their relationship are given by the supreme court, which instead noted that "[i]t is not necessary to relate the evidence in detail." *Id.* at 54, 365 P.2d at 255. So, the alleged factual similarities between *Peterson* and this case cannot and do not dictate the outcome here.

¶ 29    As alluded to above, however, the supreme court's decision in *Ward* is instructive. In *Ward,* Martha French appealed a judgment finding that she and her former husband, Will Feagins, were not remarried at common law when he died. 153 Colo. at 327, 386 P.2d at 353. French contended, as Curry does on appeal, that it was error for the trial court to find that she was not *remarried* at common law under the more lenient standard of proof set forth in *Peterson. Id.* at 331-32, 386 P.2d at 355. But the supreme court affirmed. *Id.* at 332, 386 P.2d at 355. Notwithstanding "[e]vidence of cohabitation and some evidence that some of their acquaintances

13

considered them husband and wife," the supreme court concluded that the trial court's finding was supported by French's "use of the name Martha French in all transactions and on records pertaining to her pension checks" and by her sworn testimony in an unrelated trial that she and Feagins were not husband and wife. *Id.* at 330, 386 P.2d at 354.

¶ 30 Curry neither discusses nor attempts to distinguish *Ward.* But facts similar to those relied upon by the supreme court in *Ward* are present here. The trial court found, with record support, that in the years between their 2010 divorce and Little's death in 2015, Curry and Little identified their relationship as that of business partners on loan applications, and they filed individual income tax returns. The trial court also found, with record support, that Little identified herself as divorced in an application for public benefits, identified Curry as her ex-husband in a homeowner's insurance application, and identified Curry as her "ex-husband" in a recorded exchange with an insurance company and in a report to insurance company investigators.

¶ 31 Where one party consistently used her maiden name in legal documents and transactions, courts have affirmed a finding of no

14

common law remarriage on that basis. *See Ward*, 153 Colo. at 330-31, 386 P.2d at 354-55; *Matter of Estate of Wires*, 765 P.2d 618, 618-19 (Colo. App. 1988) (finding that a party filed individual income tax returns and used her maiden name on "all important documents" supported conclusion of no common law marriage); *see also In re Frawley*, 112 B.R. 32, 34 (D. Colo. 1990) (finding of no common law remarriage not erroneous even under relaxed *Peterson* standard because, among other things, parties filed individual income tax returns). Curry does not dispute the trial court's findings showing that Little consistently represented herself as unmarried in financial transactions and legal documents.

¶ 32    At the hearing, Little's brother also testified that he kept in regular contact with his sister, but she never indicated that she was remarried. The trial court found the brother to be a credible witness.

¶ 33    Curry does not identify any case in which a court considered similar evidence but found a common law marriage. He contends, however, that the requisite elements were established by the testimony of three witnesses at the hearing — two employees of their business and a friend of Little's. These witnesses testified that

15

he and Little held themselves out as husband and wife after their 2010 divorce. While this testimony is certainly relevant, it is insufficient to warrant reversal given the substantial evidence to the contrary, which the trial court credited in reaching its decision. We defer to the trial court's determinations on issues of fact and credibility. *See Lucero*, 747 P.2d at 665.

¶ 34 We next turn to Curry's contention that the trial court erroneously determined that he lacked standing to seek reformation of Little's will.

### B. The Trial Court Erred In Dismissing Curry's Reformation Claim

¶ 35 As noted above, Curry asserted an alternative basis for his claim that the court should find he is a beneficiary of Little's will — reformation pursuant to section 15-11-806. Relying on *In re Estate of Johnson*, 2012 COA 209, however, the trial court concluded that Curry lacked standing to assert such a claim. Curry contends that dismissal of this claim for lack of standing was error. Curry makes two arguments in this regard: either *Johnson* is distinguishable or, in the alternative, it was wrongly decided and we should not follow it. Although we do not think that *Johnson* is distinguishable, we

16

are unpersuaded by its analysis of the standing issue and, therefore, decline to follow it. Instead, we conclude that Curry had standing to seek reformation, and, therefore, we reverse and remand for additional findings on Curry's reformation claim.

### 1. Legal Principles

¶ 36    We review whether a party has standing de novo. *Jones v. Samora*, 2016 COA 191, ¶ 21. We also review questions of statutory interpretation de novo. *UMB Bank, N.A. v. Landmark Towers Ass'n*, 2017 CO 107, ¶ 22.

### a. Standing

¶ 37    In Colorado, "parties to lawsuits benefit from a relatively broad definition of standing," *Ainscough v. Owens*, 90 P.3d 851, 855 (Colo. 2004), and the standing test has "traditionally been relatively easy to satisfy," *id.* at 856.

¶ 38    In a probate proceeding, a party must be an "interested person" to have standing. *See Estate of Milstein v. Ayers*, 955 P.2d 78, 81 (Colo. App. 1998); *see also* § 15-12-705(1)(k), C.R.S. 2018 ("[A] court will not routinely review or adjudicate matters unless it is specifically requested to do so by a beneficiary, creditor, or other interested person . . . ."). An interested person

> includes heirs, devisees, children, spouses, creditors, beneficiaries, and any others having a property right in or claim against a trust estate or the estate of a decedent, ward, or protected person, which may be affected by the proceeding. . . . *The meaning as it relates to particular persons may vary from time to time and shall be determined according to the particular purposes of, and matter involved in, any proceeding.*

§ 15-10-201(27), C.R.S. 2018 (emphasis added). As is evident from the last sentence of the definition, determining who qualifies as an interested person in a probate proceeding is highly context dependent. *Id.* And an interested person generally includes a potential devisee under a will. *In re Estate of Evarts*, 166 P.3d 161, 164 (Colo. App. 2007).

### b. Revocation and Reformation

¶ 39 As discussed above, section 15-11-804(2) provides that the dissolution of a marriage revokes any revocable disposition of property by the divorced individual to the former spouse, unless revocation contravenes "the express terms of a governing instrument, a court order, or a contract relating to the division of the marital estate made between the divorced individuals." Section 15-11-804(2) "represents a legislative determination that the failure

18

of an insured [or a testator] to revoke the designation of a spouse as a beneficiary after dissolution of the marriage more likely than not represents inattention." *DeWitt*, 54 P.3d at 852. The statutory revocation of spousal transfers upon dissolution of marriage thus "attempts to give effect to the presumptive intent of the decedent." *Id.*

¶ 40 More than a decade after the adoption of section 15-11-804, the Colorado General Assembly enacted section 15-11-806, which allows a court to

> reform the terms of a governing instrument, even if unambiguous, to conform the terms to the transferor's intention if it is proved by clear and convincing evidence that the transferor's intent and the terms of the governing instrument were affected by a mistake of fact or law, whether in expression or inducement.

By authorizing reformation of an unambiguous will, section 15-11-806 "provides a means by which disappointed beneficiaries can litigate what they perceive to be the testator's true intent." *Baker v. Wood, Ris & Hames, Prof'l Corp.*, 2016 CO 5, ¶ 36.

## 2.     Analysis

¶ 41     With these concepts in mind, we turn to the questions (1) whether Curry has standing to assert a reformation claim, and (2) if so, whether remand is required.

### a.     Curry Has Standing To Pursue a Reformation Claim

¶ 42     The trial court relied on *Johnson* to find that Curry lacked standing to seek reformation.  Given that *Johnson* is the only case to address standing under section 15-11-806, we will turn to it as our starting point as well.  In *Johnson*, the petitioner, Laurel Christensen, sought reformation of her deceased ex-husband's life insurance policy to recognize her as the beneficiary.  *Johnson,* ¶ 6.  Christensen claimed that her ex-husband intended for her to remain as the beneficiary, notwithstanding their divorce.  *Id.* at ¶ 20.  The trial court dismissed Christensen's reformation claim pursuant to C.R.C.P. 12(b)(5).  *Id.* at ¶ 6 n.1.  On appeal, a division of this court affirmed the dismissal.  *Id.* at ¶ 1.  The division concluded that, "by operation of section 15-11-804(2), Christensen was removed as beneficiary to Johnson's life insurance policy . . . upon her divorce."  *Id.* at ¶ 22.  With this conclusion, we agree.  But the division in *Johnson* then held that, because Christensen's

divorce from Johnson removed her as a beneficiary of his insurance policy, she "lacked standing to bring a reformation claim under section 15-11-806." *Id.* It is here that we part ways with the division in *Johnson*.

¶ 43    The trial court was bound by *Johnson*. *See, e.g., Scott v. People*, 2017 CO 16, ¶ 17. But, unlike the trial court, we are not bound by another division's holding. *People v. Zubiate*, 2013 COA 69, ¶ 48, *aff'd*, 2017 CO 17. And we are not persuaded by the standing analysis in *Johnson*. We read *Johnson* to hold that an ex-spouse whose claim is revoked pursuant to section 15-11-804 lacks standing to assert a reformation claim pursuant to section 15-11-806. The implied premise of this holding appears to be that a petitioner seeking to inherit under his or her former spouse's will has only one remedy: section 15-11-804(5), which provides that remarriage or nullification of the divorce revives any provisions in a will that were revoked upon divorce. But we do not read section 15-11-804(2) as foreclosing a former spouse from bringing a reformation claim under section 15-11-806. And if we were to follow *Johnson,* any reformation claim brought by a former spouse,

21

even if meritorious, would fail for lack of standing. But nothing in either statute supports this result.

¶ 44    Instead, we view the revocation and reformation statutes as serving distinct but complementary purposes. On the one hand, the revocation statute — section 15-11-804(2) — "attempts to give effect to the presumptive intent of the decedent" by revoking any spousal transfers upon dissolution of the marriage. *See DeWitt*, 54 P.3d at 852. Revocation is thus intended to conform the will to the testator's *presumed* intent. On the other hand, the reformation statute, section 15-11-806, is intended to give effect to the testator's *actual* intent. *See Baker*, ¶ 36 (Section 15-11-806 "provides a means by which disappointed beneficiaries can litigate what they perceive to be the testator's true intent."). Yet by holding that a divorce eliminates standing to seek reformation of a former spouse's will, *Johnson* would require that we uphold the testator's presumed intent despite clear and convincing evidence of the testator's actual intent. This incongruous result further supports our conclusion that the General Assembly did not intend for section 15-11-804(5) to be the exclusive remedy available to a petitioner in Curry's shoes.

¶ 45    The revocation statute also serves a "gap-filling" function that complements, not supersedes, the reformation statute.  As explained by the Restatement (Second) of Property § 12.1 cmt. 9 (Am. Law Inst. 1995), "[e]very state has numerous statutory rules of construction that purport to govern when the will is silent."  Section 15-11-804(2), which does not operate when contrary to the terms of the will itself, is such a "gap-filling" rule.  *See id.* ("Except as provided by the express terms of a governing instrument . . . .").  But the operation of such a "gap-filling" rule does not foreclose a former spouse from seeking reformation, as *Johnson* held.  To the contrary, because "reformation puts [the testator's] language back in the will, there is no gap for the gap-filling statutes to fill."  Restatement (Second) of Prop. § 12.1 cmt. 9 ("[S]tatutory gap-filling rules do not take precedence over reformation in a well-proven case of mistake.").

¶ 46    Moreover, even if we recognize that a former spouse has standing to seek reformation under section 15-11-806, he or she must still prove the testator's intent by "clear and convincing" evidence.  This heightened standard of proof "deters a potential plaintiff from bringing a reformation suit on the basis of

23

insubstantial evidence." Restatement (Second) of Prop. § 12.1 cmt. e.

¶ 47    In short, we conclude that nothing in section 15-11-804, section 15-11-806, or the overall statutory scheme indicates that the General Assembly intended to exclude a former spouse from pursuing reformation pursuant to section 15-11-806 or that it intended section 15-11-804(5) to be an ex-spouse's sole and exclusive remedy for avoiding a statutory revocation precipitated by a divorce. Accordingly, we conclude that Curry has standing to pursue his reformation claim pursuant to section 15-11-806.

### C.    Remand Is Required

¶ 48    The Interested Parties also contend that, even if Curry had standing to seek reformation, we should affirm on the alternative ground that Curry has failed to state a claim for reformation. We are not persuaded.

¶ 49    The record does not support any conclusive characterization of Curry's reformation claim. The Interested Parties are correct that section 15-11-806 is unavailable to reform a will based on a testator's post-execution change of mind, *see Fischbach v. Holzberlein*, 215 P.3d 407, 409-10 (Colo. App. 2009), or to correct a

testator's failure to prepare and execute a new document, *see* Restatement (Second) of Prop. § 12.1 cmt. h.  Even so, the complete evidence supporting Curry's reformation claim was not heard at the hearing.

¶ 50     The trial court found that Curry lacked standing and, on that basis, excluded evidence he sought to introduce in support of his reformation claim.  The trial court also struck the portions of his closing argument relating to reformation.  Nor did the Interested Parties ever seek dismissal of Curry's section 15-11-806 claim pursuant to C.R.C.P. 12(b)(5).  As a result, although we express no opinion on the merits of Curry's reformation claim, we conclude that the record is insufficient to support a determination as to whether Curry has stated or will be able to prove a cognizable reformation claim under section 15-11-806.  Therefore, remand is both appropriate and necessary.

## III.   Conclusion

¶ 51     For the reasons set forth above, we affirm the trial court's order determining that Little and Curry were not common law remarried, but we reverse the dismissal of Curry's reformation claim

under section 15-11-806 and remand for further proceedings and presentation of additional evidence on the reformation claim.

JUDGE ROMÁN and JUDGE DUNN concur.